Good morning, your honors. May it please the court, Cheryl Sturm for the appellant, Michael Woods. Mr. Woods asked the court to find that the district court erred and denied due process to him when Mr. Woods' motion for a severance to preserve his right to a speedy trial guaranteed by the Sixth Amendment was denied. The indictment against Mr. Woods was unsealed on November 18, 2008. The government did not submit a formal extradition request to Canada for Mr. Woods and his co-defendant, Donnell, until March 9, 2012. According to the government's brief, at page 30, Mr. Woods was in custody beginning in June 12 in Canada. We suggest to the court that the 3-year and 4-month delay in requesting extradition alone constitutes a failure to exercise due diligence by the government. Counsel, I understand from the government's submission that they're suggesting that an indication of extradition was made at least as early as October of 2009. Do you dispute that fact? I don't dispute that an indication was made. However, no formal motion was made. Apparently, the making of the formal motion is what triggered taking the defendants into custody because the defendants were taken into custody in Canada shortly after the formal motion was made. And I understand you're not contesting that at least for some period of time Mr. Woods was fighting extradition, is that correct? That's correct, Your Honor. Is your belief that had the government proceeded earlier he would not have done so? Or is it simply that the time that it would have taken him to resolve that matter would have been that much earlier? The latter, Your Honor. But also, according to USA vs. Moreno cited in our brief, Mr. Woods has no responsibility to bring himself to trial. And no one is suggesting otherwise. Thank you. Please continue. Thank you. Mr. Woods was responsible for the delay, but that conclusion is contrary to Second Circuit precedent, as I just cited to Moreno. And the government must use due diligence in attempting to locate and apprehend the accused. Didn't the district court in essence state on the record that the court found that the government had exercised diligence in pursuing extradition? Well, Your Honor, this Court is reviewing this matter de novo, I believe, and the Court has all of the evidence before it that the district court judge had in making a decision as to whether that was a reasonable conclusion. Is that a factual finding or a legal determination? Well, I think it requires a careful review of the facts, starting with when the indictment was unsealed, when the defendant was taken into custody, when extradition proceedings were initiated. And the government has not really pointed to any diligent efforts it made to obtain the extradition of Mr. Woods for more than three years. The government's brief does not point to a single effort it made to contact Woods or extradite Woods until three years and four months after the indictment was unsealed. And instead of filing the formal motion for extradition that it eventually filed, instead the government filed numerous motions for exclusions of the time under the Speedy Trial Act. And those efforts are outlined in the government's brief at pages 28 to 29. The government wants to attribute the diligence and delay between indictment and cessation of the fight against extradition to Woods, but as I said earlier, according to Barker, the defendant has no duty to bring himself to trial. On December 19, 2014, Mr. Woods filed a motion for severance from the only other defendant going to trial. Certainly at that point it was no longer a complex case. Looking at the record in this case, it's fairly lengthy, but it's pretty much a standard, straightforward drug prosecution. And there were only two defendants going to trial at the time Mr. Woods filed his motion for severance. In the order denying the motion for severance to protect Mr. Woods' right to a speedy trial, the judge engaged in a Barker-Wingo analysis. The court did not hold a hearing, but as I've said, it's our position that the evidence in the record available to this court is the same as was available to the district court. There's been a change in the analysis brought about by U.S. v. Togano, 880 Fed Third 602, Second Circuit, 2018. The government argues at pages 56 to 57 of its brief that Mr. Woods did not assert his constitutional speedy trial right in a manner that would support his claim under Barker. The government claims Woods did not raise a constitutional claim expressly, but Togano says the defendant's failure to formally raise the right via a motion does not necessarily count against him. We're not agreeing that the motion was not sufficient, but in any manner, this circuit has now found that he need not formally raise it because it's guaranteed to all defendants by the Sixth Amendment and not amenable to rigid forfeiture rules. Thank you. Good morning, Your Honors. May it please the Court, Michelle Barth on behalf of Mr. Dinnall. I'd like to begin with the sufficiency of the evidence claim, and in particular the five supervisees argument. And I think it would be beneficial to briefly recap the government's theory at trial as to Mr. Dinnall. At trial, the government alleged that Mr. Dinnall was himself a driver in the DTO initially. Mr. Dinnall worked as a driver until June 2006, when he was arrested during a run to Mike Harris. According to the government, Mr. Dinnall was then promoted to manage the couriers. And in that capacity, Mr. Dinnall would give directions to drivers about where to go, whereas all the money matters were handled by Debbie Francis and Michael Woods. Now, the government's case against Mr. Dinnall consisted almost entirely of the testimony of drivers who were rotated in and out of one or two runner positions. Like Mr. Dinnall, once a driver was arrested or otherwise unavailable, he or she was simply replaced with a new driver. And there were four couriers or drivers who testified at trial? Yes, but there were only two courier positions within the DTO at most. So our main argument regarding sufficiency of the evidence is that the organization or CCE must have at least five slots or positions over which Mr. Dinnall supervised. And for this issue, we find support in the Seventh Circuit's case of United States v. Bond, 847 F. 2nd at 1237. Now, we are not arguing that the government had to prove that the defendant must supervise five positions simultaneously, nor would it be necessary that the government prove that the defendant supervised the same five persons through a continuous series of crimes, but is not . . . The argument is that he had to have supervised five at one time? No, that there must be . . . if you were to construct a table of the DTO, that there were at least five slots or positions over which Mr. Dinnall supervised in order to find him guilty of the CCE. But that's the question that Judge Chin just had and I have as well. You're saying it doesn't have to be at the same time, correct? That's correct. Okay, but how do . . . so what do you mean then, please? The same . . . not all five positions have to be filled at the same time. But there has to be five slots even if unfilled? Yes. I see. And that's what the Seventh Circuit decision says? That's right. In bond, the evidence is insufficient if the defendant supervised five other people when it is clear that one or more of the five merely replaced one of the others, and that's bond 847F2nd at 1237. And the focus on positions is consistent with the observation that the Kingpin statute is aimed at the principals who profit the most from large criminal organizations. Now in response, the government does not discuss, distinguish, or even cite bond, the leading case on the issue. And likewise, the government cannot contest that from an evidentiary standpoint, there were never five or more slots or positions within the framework of the CCE, let alone any five positions over which Dinnall supervised. In its answering brief, the government simply names all of the drivers who rotated into and out of those one or two positions. And this accords . . . the evidence supports that there were only two courier positions. This accords with Debbie Francis' testimony that the DTO moved on average one load or perhaps two per week. This accords with Mike Harris' testimony that the DTO moved on average one or two loads a week. This was true even when Doogie Sunday was involved, and Woods took over her buyers, which included Harris. And Doogie had two drivers to run her operation, and when Woods took over, he had two drivers. And Bryce Cumming, a courier within the organization, testified that on the day of his arrest, he didn't want to do the run, but he was convinced to do it because they had nobody else. You're our guy. And that's at 8A544. So what does this mean? While there were various drivers who worked within the conspiracy, there was never more than one or two driver positions total. Each new driver was a mere replacement, as opposed to separate cogs within a larger ongoing courier network. I'd also like to briefly address the district court's error when it failed to grant the defense's request for a continuance when defense counsel had two and a half weeks to prepare for a trial in a complex international drug conspiracy case in which he was facing a mandatory life sentence. Now, that continuance request was reasonable, and it was moderate. And it was related to Mr. Dinell's request for a new attorney, which he had made three months prior to the trial date. There is a theme in the government's brief that Mr. Dinell was obstructionist. But he made his request for a new counsel in early May, and then it reached the court in late May. But the hearing is not held on that issue until early July. That's right. That's the lag you're pointing to. That's exactly right, Your Honor. The court and counsel... It's not the case that the magistrate judge advised Mr. Dinell specifically that he understood that the trial date was inflexible, and that if Mr. Dinell was choosing to replace counsel, he should assume that that trial date was not going to move. I think it's important to read the entire transcript, because what the judge also told Mr. Dinell, and this is at A273, well, it will be up to Judge Mordew as to whether or not he would grant an adjournment, which I assume new counsel will want in order to prepare this case. Does that statement not follow a discussion by the government in which the government is noting or suggesting a tension between Mr. Dinell's request for a speedy trial and refusal to sign an exclusion of time and his request for this adjournment? I agree that it seems to be pointing to a tension, but I don't think that tension is realized here, because when defendants demand a speedy trial, they mean a speedy trial with constitutionally effective counsel. A client should not be forced into choosing between these two important constitutional rights. And I also want to note that it was the court's dilatory response to his constitutionally appropriate request for a new attorney that forced the client into a Hobson's choice of going forward with an attorney who was not preparing the case or getting an attorney who was willing to prepare the trial but had no meaningful time to do so. May it please the court. Rajiv Dosanjh for the United States. I think at the outset, I think it's important to note the standard of review here that applies to most of the claims here. It's plain error. And that flows from the fact that nearly all the claims that are made on appeal were not made below. And this, I think, structures how the burdens are shifted here. On the last point on the adjournment, it does seem problematic that the court delayed almost two months or more than two months, even considering the request for new counsel. New counsel comes in and is handed all this discovery and is expected to be ready for trial in 18 days. Your Honor, I think here, again, I think it was, Mr. Donnell was given a very clear warning when he asked for a new counsel. And I think it's important to look at the- The magistrate judge said it's going to be up to Judge Mordew. But he also said, I've been informed in no uncertain terms by Judge Mordew that he anticipates trying this case on July 27th and will not move that date. So if someone is appointed today, that attorney essentially has. If the request for new counsel had been addressed in a timely manner, the court might have been able to hold to the trial date with new counsel in having adequate time to prepare. That is true, Your Honor. But I think it's also true that you have to look at the entire history of this case here. Well, that's one of the problems for me, is the entire history of the case. There are several problematic things. I mean, I don't know what the bottom line is. And I don't know if it's enough, but the off-the-record conversation, the submission of the heavily redacted indictment. I mean, trial judges are not supposed to do these things in our circuit. You're not supposed to have an off-the-record discussion in a criminal case. You're not supposed to submit a heavily redacted indictment. And then the assistant says to the jury, oh, there's some things in here that you should not consider. I mean, it just, it's not good practice. Well, Your Honor, I think here also you're dealing with two defendants who had taken inconsistent positions throughout the course of this case. And if I could address the adjournment issue again, you have to look at what actually happened at trial. And counsel here was well prepared. He cross-examined these witnesses very closely on detailed matters. He hasn't shown, there hasn't been a showing of prejudice here that would allow us to reverse this on the abuse of discretion. Woods also opposed the request for an adjournment. So you have that factor as well. And this is also a case with mandatory life if convicted. A lot of cases have very strict penalties, Your Honor. I don't think you assess whether the judge is abusing discretion here based on a potential outcome at trial that hadn't happened yet. And that was based on the death penalty case. I mean, death penalty, there are additional procedures for the death penalty. I think there may be more procedures under the due process clause that are allowed. But I think here you have a serious case, no doubt. But you have a co-defendant who wants to move forward. You have an attorney who shows himself to be very well prepared. You have on the day of trial a request. He showed himself to be very well prepared? Is that not an overstatement? I don't believe so. He said, I'm not ready. He basically said, you know, I'm going to go if I have to. And I think if you look at what he was talking about, I think at that moment, which is the day of trial, what he was talking about was this witness, Sean Ryan, that they weren't able to get employment records from him from the Home Depot where he worked. That was an important issue, this witness? It was, Your Honor. And that discussion took place off the record? It took place on the record and then off the record. But on the record, Mr. Dinell provided his reasons, was there at the time he heard the . . . The matter was resolved, apparently, off the record. And then it was explained to Mr. Dinell what was happening. There was no objection in this case. The court's case law is very clear that once you don't . . . And actually the Supreme Court's case law is very clear that you waive the objection if you say silent. Government's constant refrain in this case is that there was waiver or there wasn't plain error. But really, there shouldn't be error at all. Your Honor, you're entitled to a fair trial. You're not entitled to a perfect trial. And here, under the United States v. Gagnon, which we recite in our brief, this is a waiver. He heard the disposition of the in-conference, in-camera meeting. He did not object. He did not object later after trial. The disposition was that the witness, Ryan, would not testify. That's correct. And that was . . . As Dinell's attorney and Dinell sitting there at the time acknowledged, that was . . . We were ready to go at that point. That resolved the issue by all intents and purposes. From the transcript, it's obvious that that was the issue they were worried about, and that was resolved in their favor. Can I ask about another period of delay in the case, though? Forty months to make a formal extradition request does seem like a long period of time to contact the Canadian authorities and put in the formal request, which the government is fully aware is itself going to take a lengthy period of time. Your Honor, I think, again, this goes back to the fact that this claim was never raised. We never had an opportunity in the district court to have a hearing on what efforts were being made. And I think that hearing would have showed that there's a lot of back and forth, but this is all outside the record because Mr. Dinell and Mr. Woods never raised this claim below. It was just not raised. So we can't build the record, and this court has no record to find an unreasonable delay or negligence. And especially under plain error, I don't think you can find a clear or obvious error here when Mr. Dinell never raised the claim. And a refusal to sign one stipulation is not a claim of pre-extradition delay. That just does not raise the claim. It may say that I want to go forward, I want to go to trial right now, which, again, is inconsistent with his later request for an adjournment. But it's, again, it's not the assertion of an error or a right here. In returning to one of the points that my colleague made, this redacted indictment going back to the jury, I mean, I think that is pretty clear in our case law that practices like that are to be avoided. To be avoided here, Your Honor, but I think it was done with the hope of avoiding confusion. And I don't think that there is, you know, if you look at the redactions, the claim that they were somehow prejudicial I don't think is borne out by the actual indictment itself. And this claim that I disagree, because if you look at the redactions, you see that they are done, they make clear that there are individuals whose names are being redacted. And since these two gentlemen are at the top of this caption, one could just count the number of boxes underneath and intuit that there are five or more individuals who are subordinate to them. And so I think it's difficult to read. And it could not have been that tough to go back and get the Word document and just delete all of this, correct? That is correct, Your Honor. And I think also there's another question here about what actually happened. And we don't have on the record exactly what was given to the jury. Whose fault is that? Shouldn't the indictment that was submitted have been marked as a court exhibit? That would have been preferable, Your Honor, but I think it's So now we don't know what exactly was submitted. We do not, Your Honor. We do not know exactly the form of what was submitted. But again, I think How can we decide whether there was prejudice if we don't even know for sure what was submitted Well, again, Your Honor, I have to go out of the record. And the court denied our efforts to supplement the record with some indication of what was going on. But again, it was clear that there was going to be redactions made. There was no objections, again, by defense attorneys here. So again, you would have to review this under plain error or even perhaps a waiver if they agreed to these redactions. And this was done really to, and when you think about the redactions, it also focuses the jury's attention on the fact that Defense counsel highlights, I guess it's paragraph six from the redacted indictment. And the way Tonell's name is left there, then there's some things blacked out. And then it says he did not reveal much about the DTO. And that suggests that he did reveal something about the DTO. Your Honor, I would urge the court, this is a very important point, I would urge the court to look at the context of that redaction. What it's talking about is his discussions with the couriers, not the police, not law enforcement. He did not reveal much to the couriers about the structure of the organization. That was proven again and again at trial. This is a completely ripping out- He says he knows something about the DTO and that's incriminatory. Obviously. Because it's, obviously that's what was proven at trial. And it's not, this is not a statement to law enforcement. This is a complete distortion of what was going on here. Courier after courier related to the jury, I was kept in the dark about what was going on here. And the evidence showed that Donnell knew exactly what was going on. He was directing all these different couriers. But an indictment is not evidence. But there is evidence, Your Honor. And I think the idea that this redaction suggests something outside the evidence is completely false. Well, it's reinforcing the evidence to some extent, I suppose. But then there are clearly are other, there are overt acts listed. And then the assistant is saying to the jury, there's no evidence to prove those overt acts. And if that's- And how does that come- Why are they being presented to the jury? If there's no evidence to prove- They weren't. I mean, they were taken out. And what it highlights is, is that you have to go by what we, the evidence that was actually presented at trial, not the indictment. It cuts both ways. It suggests perhaps that you have to look at the evidence and not the indictment. And the jury did that. It found, it refused to find guilt on certain overt acts that were not the ones the court and the AUSA said are taken out. So it reviewed the evidence very closely and gave a very careful verdict in this case. If I could- Counsel, if I could just change topics for a moment. To talk about the testimony of Agent Merkel- Yes. His references that I imagine you're going to tell us are inartful to Mr. Dinell's invocation of his right to counsel and his refusal to cooperate. Why, why did that have to come out? Your Honor, it was not a testimony that we elicited intentionally. This was, if you look at the, if you look at the, the context, as far as his invocation of counsel, the, what was that, that was being done to, to establish a basis for why he got the handwriting exemplar. There was no suggestion in the AUSA's question, I want to know about his, like whether he his question was, was really directed as what is a handwriting example? And as soon as the, the witness said that, the AUSA moved on. It was never mentioned again in closing. So this is not- Even if it was not intentionally elicited, is it, is it still not a problem? I think it- His comment on his refusing to cooperate and invoking his right to counsel. Your Honor, I think that's, the case law is also clear. You have to view this in the framework of what, you know, this, this kind of accidental bringing out of testimony happens all the time and what, whether the government made use of it is really the key issue. And the government made no use of this. We never mentioned it again. And that happened again with, with the other issue about his cooperation. It was not, just not used at trial and it was not intentionally brought out. There was, I think that you cannot say this was really a misconduct here. This was a witness who didn't understand perhaps what he should have not said, but there was no effort by the government to, to, to exploit that. I think that's what's key to this court's decisions in finding some harmful error here. Could you address Mr. Donnell's argument about sufficiency, that the, that the case law would support an argument that you at least need five slots and the evidence is sufficient, is insufficient to show five slots as opposed to rotating couriers? Your Honor, the, the CCE statute says nothing about slots. It says it's best supervision of five persons, five. It doesn't say five positions. It doesn't say five roles. And this court has repeatedly said that supervisor relationships between the defendant and his five subordinates do not have to occur at the same time. And it's called the continuing criminal enterprise for a reason. You do not have to take one time slice and look at it, um, at, in isolation. And here, I think once you get rid of the idea that it doesn't Suppose it's supervising one person at a time and there are more than five. I mean, it over time, like it's over time, but that seems like a smaller operation than five slots at a time. And, and so is there anything that tells us the statute was intended to cover a situation where it's five people over time, but a smaller operation? I think Your Honor, I think that you're perhaps referencing Judge Posner's dissent in Bafia where he talks about this problem. Um, but this is not a small time operation. This is an operations carrying massive quantities of drugs, uh, from Canada and returning to Canada with massive quantities of drug proceeds. Um, the Dell's role in this organization was to supply numerous distributors on the East coast, um, in Boston, Pittsburgh and elsewhere. Um, and I think if, if you consider this example, say that there's a drug organization that has four distributors in various cities and there's one person who manages those four. Now say they go through those distributors, you know, three in each city because they keep getting arrested and each distributor has his own customer base. Um, I think it would be an absurd result to say that that person is not managing a CCE when he's managed 12 people over time. And the effect of that may be greater than if at one time he managed 12 distributors and they were arrested immediately. Um, that is not a, a, a, a, a sound policy reason. And he's asking what's, what the, what, uh, Mr, uh, Before you sit down, um, another area is, um, life imprisonment in a marijuana case in this day and age. Um, why is that not cruel and unusual punishment? Well, I think your honor, I think we've, we, we go through that in our brief. I think the case law does not support that. I think if you look at Harmelin, that was a first time offender who was found just in possession of cocaine, uh, about 650 grams of cocaine. Um, the Supreme Court said that is not an unconstitutional sentence. The legislature has the ability to do that here. This is not, uh, marijuana is one part of this is what the, the drug that was used in this enterprise that we charged, but this is a continuing criminal operation. This is, this is large scale drug trafficking. Again, it generates huge proceeds and those proceeds end up going upstream, um, to woods suppliers and potentially enabling who knows what in terms of, of, uh, criminal activity. It also preyed on numerous people in an economically disadvantaged area, getting them caught up into the, into criminality. Um, and again, this is not Mr. Donnell's, it was his first time conviction, but the CCC, CCE required that he engaged in numerous acts and he did over a course of a lengthy course of a period of time. He engaged in massive amounts of, of drug trafficking. Um, and again, I think the statistics as well do not, do not support the position that this is unconstitutional. Um, as we cite 95 defendants in the last 16 years have been sentenced to life for marijuana only crimes. Um, so the, the legislature, Congress has the ability to say marijuana is a serious enough problem. I don't think that we've, the defendants have established any societal consensus that drug trafficking of marijuana on this scale, um, would not merit a life sentence. Um, and if I could just return to one point about the CCC, CCE, um, I think one of the main issues here is that if, what, what Mr. Donnell and to the extent Mr. Woods is asking is, is a new requirement to be read into the law. Um, and uh, although I think I want to make a distinction that I didn't perhaps make in my brief, uh, the sufficiency of the evidence claims were preserved here, but what he's asking for is a new interpretation of a law position that was never raised in the district court. Um, again, I think that would have to be reviewed under plain error. Um, uh, as far as a legal point about what the statute requires, um, as far as the framework under which the evidence must be assessed. Um, thank you. Um, briefly addressing the standard of review. Um, uh, as, um, is a, is a standard of review set out in Togano regarding the speedy trial clause. Um, Togano points out that this is a Sixth Amendment violation. It's guaranteed to all defendants by the Sixth Amendment. And, um, while the court might consider the invocation of defendant's right, which defendant certainly did not sit on his rights in this matter, the formal procedure requirements are out of place in this context. And, um, this . . . Was the issue raised? And how was it, if so, how was it raised? The defendant in December, um, I believe of, uh, 2014 filed a motion, um, uh, for a speedy trial. He, he filed, I'm sorry, he filed a motion for severance. Severance, yeah. Yes. And the judge . . . So he never made a motion to, to dismiss, uh, or the pre-indictment delay or . . . He, he had not done that previously, Your Honor. But the judge did engage in a Baker versus Wingo analysis of the severance motion. Um, on the sufficiency of the evidence issue, um, a Rule 29 motion was filed after trial, raising a sufficiency of the evidence, um, in that motion. And, um, therefore we don't think it should be reviewed for plain error. On the confrontation clause that, um, various members of the panel have, um, questioned about, um, we also want to point out that in Mr. um, Woods' case, there was no limiting instruction given that whatever was coming out, whatever harmful evidence was being elicited about the, um, uh, invocation of Mr. Dinell's rights to remain silent . . . Was one requested? Uh, was a limiting . . . No, Your Honor. Was not requested. Um, um, and, um, uh, but in, in, uh, in, in, I think the law was clear, uh, as to whether, uh, if a non . . . a testimonial hearsay is being used against one of the defendants, a limiting instruction is required. Thank you. Thanks. Good morning again. Um, the government ignores the cumulative effect of all of these errors. It did not address the cumulative effect of all of these errors in its brief or, or today. There, there certainly are quite a few problems, but it also seems to me the, the evidence was pretty strong of, uh, a marijuana, substantial marijuana operations. Well, I, I disagree on, on that point. I think there were solid defenses to each of the elements of, of the offense. Um, the government did not prove that there were five supervisee slots at any given time, not at trial, uh, and not in its brief. But . . . Could you respond to the government's argument that, uh, that, uh, we should use plain error in reviewing that claim because though a sufficiency argument was made below, that particular claim as to the need for slots was not brought to the attention of the district court? A general, well, one is the government conceded. It was de novo review in its brief, but also a general rule 29, uh, uh, motion is sufficient to preserve claims, uh, and it's claims that we're concerned with. Um, this is an argument in support of a claim that the evidence was insufficient. Um, so in outlining the cumulative effect of all of these errors, you have the government committed Doyle error during its direct examination of its own case agent. Um, that we didn't talk about this today, but the government also conceded that it committed Crawford error when the case agent testified without restraint about the statements of non-testifying cooperating witnesses. And the defense attorney had . . . But I thought their point was that that was actually invited error by defense counsel's questioning. I think that defense counsel was so ill-prepared for this trial, it had, he had no idea that those statements were, were testimonial in nature. Um . . . But then after the trial and the motion to have him relieved as counsel, did he not say that he felt that he was adequately prepared for trial and that he would not have done anything substantially differently given more time? He, what he said was he did the best he could under those circumstances. And he did say he did not think that he would have done something different had he been given more time, but he was being able to comment on his own performance. And I don't think a statement like that should be given any weight. Um, moreover, how would he know what he could have done unless he had been given more time? And when you look at this, you see that he had two and a half weeks to prepare this complex international drug conspiracy case in which a life sentence was in the balance. And of course, under those circumstances, the attorney filed no motions, called no witnesses, conducted little to no investigation, missed obvious objections at trial. There was just no time to develop a defense, and there were several as to each of the elements of this offense. And Mr. Donnell is sentenced to die in prison for marijuana trafficking, and he has no prior criminal convictions. So even if you find that none of these errors rise to the level of reversible error, we respectfully submit that cumulatively they do. And I wanted to make one point about the Eighth Amendment that Judge Chen brought up. There is a case, United States v. Rivera-Ruperto. It's out of the First Circuit. That's 2008 Westlaw 1060694. It was decided on February 27th of this year. Five judges joined in a concurrence, asking the Supreme Court to revisit its Eighth Amendment jurisprudence regarding grossly disproportionate sentences. Now this was in the context of 924C, but the reasoning is equally applicable here. The defendant received a sentence in that case of more than 100 years, despite the fact he had no prior criminal history. The court, the First Circuit, would otherwise have found his sentence to be cruel and unusual. Ms. Barth, thank you all. We'll take the matter under advisement.